IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA
FOR THE USE AND BENEFIT OF
MODERN MOSAIC, LTD.,
a foreign business corporation,

    Plaintiff,

v.                                      Civil Action No. 1:16CV12
                                                   (STAMP)

TURNER CONSTRUCTION COMPANY,
a New York corporation,
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA,
FEDERAL INSURANCE COMPANY,
FIDELITY & DEPOSIT COMPANY OF MARYLAND,
ZURICH AMERICAN INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY and
THE CONTINENTAL INSURANCE COMPANY,

    Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

This is a Miller Act, 40 U.S.C. §§ 3131-3133, case arising out of an alleged breach of a subcontract on a government construction project. Turner Construction Company ("Turner"), entered into a contract with the Federal Bureau of Investigation ("FBI") to build the Biometric Technology Center at the FBI CJIS Division Complex in Clarksburg, West Virginia. Turner entered into a subcontract with Modern Mosaic, Ltd. ("Modern Mosaic") to fabricate and install concrete panels for two structures as part of the FBI project, one of which was a preexisting parking garage. During the course of Modern Mosaic's performance, Modern Mosaic was required to provide

additional labor, materials, and equipment totaling $1,264,131.31. Modern Mosaic filed this civil action under the Miller Act against Turner and its sureties for breach of contract, to collect outstanding payments, and to enforce the Miller Act bonds. The defendants filed a motion for partial summary judgment regarding additional work and increased costs on the parking garage, totaling $975,072.31. For the following reasons, that motion is granted.

I. Facts

Turner and Modern Mosaic entered into the Subcontract on May 22, 2011, providing that Modern Mosaic would fabricate and install precast concrete panels for two structures. See ECF No. 39-2. At issue here was Modern Mosaic's work on a preexisting parking garage referred to as Building 9A. Before fabricating and installing the concrete panels, Modern Mosaic was to create shop drawings of the concrete panels and to submit those shop drawings to Turner and the architect for approval. Id. at 4. After receiving approval, Modern Mosaic was to fabricate the panels, transport them to the worksite, and install them onto the parking garage. Id. at 6-8.

As part of the approval process, the dimensions of the parking garage were to be "field verified" to ensure that they matched the parking garage's plans and specifications. Id. at 3-4, 12-13. Field verification was to take place before fabrication. Id. at 13. The parties dispute who was contractually obligated to conduct the field verification. Modern Mosaic claims that sometime in

2

August 2011 it engaged Thrasher Engineering, Inc. ("Thrasher"), a civil engineering and surveying firm, to "locate . . . on the project relative to the gridlines, and the outside corners of the structure" all of the "embeds," which are metal prongs that were embedded in the existing parking garage structure and upon which the panels would be installed. ECF No. 39-25 at 1. However, Modern Mosaic did not have the dimensions of the parking garage verified at that time.

Modern Mosaic submitted a total of four shop drawings for the parking garage panels. These included designs for two broad sets of panels, those designed to fit between columns on the parking garage in a straight line ("the flat-wall panels") and those designed to be installed on the corners of the structure ("the corner panels"). ECF No. 45-2 at 11. Modern Mosaic's first set of shop drawings was returned stamped "Revise & Resubmit" on August 23, 2011. ECF No. 39-7 at 1. The second set was returned stamped "Revise & Resubmit" on October 11, 2011. ECF No. 39-8 at 1. On January 5, 2012, Modern Mosaic began fabricating the flat-wall panels, continuing fabrication through February 1, 2012. ECF Nos. 39-13 at 6, 20; 45-1 at 5; 45-2 at 11. Modern Mosaic's third set of shop drawings was returned stamped "Revise & Resubmit" on February 3, 2012. ECF No. 39-15.

At Modern Mosaic's request, on March 1, 2012, Thrasher surveyed the entire parking garage to verify its dimensions and

3

discovered discrepancies between the parking garage's plans and specifications and its as-built conditions. ECF No. 39-19. On March 21, 2012, Modern Mosaic sent a letter to Turner notifying it of dimensional discrepancies. ECF No. 39-19. After receiving this letter, Turner forwarded the notice of discrepancies to the FBI and requested that it expedite resolution of the discrepancies. ECF No. 39-22 at 2. Later that month, Modern Mosaic sent Turner another letter suggesting certain changes to the dimensions of four different panels. ECF No. 39-20.

On April 4, 2012, Modern Mosaic submitted its fourth set of shop drawings. These were returned on April 16, 2012 stamped "Approved as Noted" with notations from the architect stating that the location of the embeds needed to be field verified. ECF No. 39-18. Modern Mosaic then began fabricating panels for the corner portions of the parking garage ("the corner panels"). ECF No. 45-2 at 11.

On May 4, 2012, Modern Mosaic sent Turner a letter noting that the parking garage was not square and plumb, causing a "dimensional bust." ECF No. 39-23. Then, on June 3, 2012, Modern Mosaic sent Turner a letter stating that it must redesign a number of panels because of the dimensional discrepancies. ECF No. 39-24. Modern Mosaic claims that the dimensional discrepancies caused the corner panels to not fit properly but that the flat-wall panels were not affected. ECF Nos. 45-1 at 5; 45-2 at 11. Modern Mosaic then had

to refabricate the affected corner panels to fit the structure and pay for storage for the unaffected flat-wall panels for later installation. ECF No. 45-1 at 5, 45-2 at 11. Turner did not pay Modern Mosaic for the costs of refabrication and storage resulting from the discrepancies and delays. Modern Mosaic claims that it is entitled to payments of those as damages totaling $975,072.31.

## II. Applicable Law

Under Federal Rule of Civil Procedure 56, this Court must grant a party's motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." Id. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted against that party. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex, 477 U.S. at 322-23. "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992). However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Moreover, "[t]he nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (internal quotation marks omitted). The nonmoving party must produce "more than a 'scintilla'" of evidence "upon which a jury could properly proceed to find a verdict for the party producing it." Id. (internal quotation marks omitted) (quoting Anderson, 477 U.S. at 251).

## III. Discussion

Turner argues that it is entitled to summary judgment as to the parking garage claims because Modern Mosaic is responsible for its own damages. Turner's argument turns on two key issues. First, whether Modern Mosaic was obligated to conduct field

6

verification of the parking garage before fabricating and installing the panels. Second, whether Modern Mosaic breached the Subcontract and must bear its own damages.

A. <u>Field Verification</u>

Turner argues that the Subcontract unambiguously obligated Modern Mosaic to field verify the dimensions of the parking garage before fabrication. Modern Mosaic argues that the Subcontract is ambiguous regarding who was obligated to field verify the structure, creating a genuine issue of material fact. Contract interpretation is a legal issue to be determined by the Court. <u>In re Joseph G.</u>, 589 S.E.2d 507, 511 (W. Va. 2003). This Court finds that the Subcontract unambiguously obligated Modern Mosaic to field verify the parking garage's dimensions before fabricating panels.

A "valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." <u>New v. GameStop, Inc.</u>, 753 S.E.2d 62, 72 (W. Va. 2013). However, "where the meaning [of contractual language] is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently." <u>McShane v. Imperial Towers, Inc.</u>, 267 S.E.2d 196, 197 (W. Va. 1980).

"The mere fact that parties do not agree to the construction of a contract does not render it ambiguous." Salem Int'l Univ., LLC v. Bates, 793 S.E.2d 879, 885 (W. Va. 2016) (internal quotation marks omitted). Flanagan v. Stalnaker, 607 S.E.2d 765, 769 (W. Va. 2004). "Contract language is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." State ex rel. Fazier & Oxley, L.C. v. Cummings, 569 S.E.2d 796, 803-04 (W. Va. 2002) (internal quotation marks omitted). Further, "a document that may appear on its face to be free from ambiguity, may be deemed latently ambiguous." Energy Dev. Corp. v. Moss, 591 S.E.2d 135, 143 (W. Va. 2003). "A latent ambiguity arises when the instrument upon its face appears clear and unambiguous, but there is some collateral matter which makes the meaning uncertain." Flanagan, 607 S.E.2d at 769 n.4. Further, "[a] contract that is silent as to a point is not ambiguous in that regard; the question presented by such silence is determination of the effect of the contract rather than interpreting its language, and the trier of fact may not make such a determination." Mountain State Coll. v. Holsinger, 742 S.E.2d 94, 102 (W. Va. 2013).

Article XI of the Subcontract provides that "[n]otwithstanding the dimensions of the Plans, Specifications and other Contract Documents it shall be the obligation and responsibility of the

8

Subcontractor to take such measurements as will insure the proper matching and fitting of the Work covered by this Agreement with contiguous work." ECF No. 39-2 at 3 (emphasis added). Article XIII provides:

> Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, the Subcontractor shall carefully examine such other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of the Work hereunder, use all means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any such improper conditions and defects to Contractor in writing and allow Contractor a reasonable time to have such improper conditions and defects remedied.

ECF No. 39-2 at 4. Attachment AP-1 to the Subcontract defines the scope of Modern Mosaic's work and provides that Modern Mosaic "shall verify and accept existing conditions ***in accordance with the Contract Documents*** at the Garage at the time of Owner's turnover of Garage to [Turner]." ECF No. 39-2 at 6-7 (emphasis in original). Further, attachment AP-5 to the Subcontract provides:

> 26. Subcontractor is responsible for taking field measurements as may be necessary to establish or verify dimensions prior to production of fabricated items. Contractor shall not be responsible to guarantee dimensions for the Subcontractor. Subcontractor shall not use other Subcontractors construction and/or layout without verifying back to established controls. Subcontractor to notify Contractor of any discrepancies between controls and existing construction.

ECF No. 39-2 at 13 (emphasis added). It further provides that each of Modern Mosaic's shop drawing submissions "must be formally certified . . . stating they have carefully reviewed the submittal,

9

verified against field conditions ***prior to fabrication*** and coordinated with all other work and is in strict compliance with the project documents. ECF No. 39-2 at 14 (emphasis in original).

The Subcontract makes clear that Modern Mosaic was obligated to field verify the dimensions of the parking garage before submitting its shop drawings for approval and before fabricating the panels. Further, Modern Mosaic was obligated to report any discrepancies or defects it found in the structure to Turner with sufficient time for Turner and the FBI to remedy the defects. Because the Subcontract unambiguously obligated Modern Mosaic to field verify the parking garage's dimensions, this Court rejects Modern Mosaic's appeals to prior and contemporaneous documents not incorporated by reference into the Subcontract and the parties' communications and stated understandings after the Subcontract was executed.

Nevertheless, Modern Mosaic proffers two arguments against this interpretation. First, Modern Mosaic argues that the prime contract obligated Turner to verify all existing conditions, remedy any "conditions detrimental to the proper and timely completion of the Work," and to "not proceed until unsatisfactory conditions have been corrected." ECF No. 39-3 at 2. However, Article II of the Subcontract contains what is commonly referred to as a "flow down" clause, and provides:

> <u>With respect to the work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to</u>

> be bound to Contractor by each and all of the terms and provisions of the General Contract and the other Contract Documents, and to assume toward Contractor all the duties, obligations and responsibilities that Contractor by those Contract Documents assumes toward the Owner, and the Subcontractor agrees further that Contractor shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract, and the other Contract Documents has against Contractor with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full. The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract, and the other Contract Documents.

ECF No. 39-2 at 1 (emphasis added). Thus, while Modern Mosaic is correct that the General Contract obligated Turner to conduct all necessary field verification, the Subcontract's flow down provision along with the specific provisions discussed above obligated Modern Mosaic to conduct field verification as it pertained to the work in the Subcontract. Thus, this Court finds that the Subcontract unambiguously obligated Modern Mosaic to field verify the dimensions of the parking garage before fabricating the panels.

Second, Modern Mosaic argues that Attachment AP-3 to the Subcontract includes "alternate" terms for the Subcontract that Turner could exercise by issuing a change order. AP-3 indicates that "Option #1" was "Not Exercised." ECF No. 45-3 at 46. Option #1 is not defined in the document. ECF No. 45-3 at 46. Modern Mosaic argues that its bid included an optional addition entitled "Add for survey of Structure and embeds at precast locations only,"

ECF No. 45-5 at 2, which it argues is "Option #1" in AP-3.  Modern Mosaic argues that Turner did not exercise that option and, thus, retained its obligation to field verify the structure.  It argues that this is in conflict with other portions of the Subcontract, making the it ambiguous as to who was obligated to field verify the parking garage.

However, Modern Mosaic's argument is flatly contradicted by the clear terms of the Subcontract.  Option #1 is undefined in the Subcontract and the parties offer competing definitions.  However, this disagreement does not create a latent ambiguity because the Subcontract unambiguously obligated Modern Mosaic to field verify the parking garage's dimensions.  Bates, 793 S.E.2d at 885.  To interpret Option #1 as Modern Mosaic suggests, this Court would have to disregard the clear language set out in at least three separate provisions of the Subcontract obligating Modern Mosaic to field verify the parking garage's dimensions.  The Subcontract "expresses the intent of the parties in plain and unambiguous language," and this Court will not interpret its terms inconsistently with the parties expressed intent.  New, 753 S.E.2d at 72.

Further, Article XXXVII of the Subcontract provides that the document "constitutes the entire agreement" between the parties and that "[n]o oral representations or other agreements have been made . . . except as stated in the [Subcontract]."  ECF No. 39-2 at 5.

The parties have offered no evidence to the contrary, and this Court finds the Subcontract to be a fully integrated written contract. Thus, Modern Mosaic's reliance on its bid is irrelevant because the bid was not incorporated by reference into the subcontract. The Subcontract's clear, unambiguous language obligated Modern Mosaic to field verify the parking garage's dimensions before fabricating any panels.

B.  Breach of the Subcontract

Having found that Modern Mosaic was obligated to field verify the dimensions of the parking garage before fabricating the panels, this Court must now determine whether Modern Mosaic defaulted on that obligation. Turner argues that Modern Mosaic fabricated the flat-wall panels before its shop drawings were approved and that Modern Mosaic fabricated the corner panels before field verifying the parking garage's dimensions. Modern Mosaic argues that it received approval for all panels before fabrication.

First, Modern Mosaic breached the Subcontract by fabricating the flat-wall panels before receiving proper approval of its shop drawings and before field verifying the parking garage's dimensions. Modern Mosaic argues that its second set of shop drawings, which were returned on October 11, 2011 stamped "Revise & Resubmit," specifically noted that the flat-wall panels were "accepted as noted." ECF No. 45-11. Modern Mosaic began fabricating the flat-wall panels in January 2012, after this

13

alleged approval. However, under § 013000 of the General Contract, revise and resubmit "means that a portion of the submittal does not comply with the design intent of the Contract Documents and that <u>fabrication, manufacture, or construction may not proceed</u>. Contractor shall make revisions and <u>resubmit entire submittal</u> only revising portions as needed." ECF No. 39-4 at 5 (emphasis added). Any work done before approval of shop drawings "shall be at the [subc]ontractor's risk." 48 C.F.R. § 52.236-21(e); ECF No. 39-2 at 16 (incorporating by reference § 52.236-21 into the Subcontract).[1] Thus, despite the architect's finding that the flat-wall panel shop drawings were acceptable, the architect stamped the submittal as "Revise & Resubmit," requiring Modern Mosaic to resubmit the entire submittal for approval before beginning fabrication. Modern Mosaic's fabrication of the flat-wall panels before obtaining final approval of its shop drawings was in breach of the Subcontract.

Second, Modern Mosaic breached the Subcontract by fabricating the corner panels in the face of known dimensional discrepancies. Modern Mosaic field verified the parking garage's dimensions on March 1, 2012 and informed Turner of the dimensional discrepancies it found on March 21, 2012. ECF No. 39-19. Turner then forwarded

---

[1]This Court notes that the clause provided at 48 C.F.R. § 52.236-21 was a required clause in the General Contract. 48 C.F.R. § 36.521. If the clause was not specifically included in the General Contract, it would be read into the contract by operation of law. <u>G. L. Christian & Assocs. v. United States</u>, 312 F.2d 418, 425-26 (Ct. Cl.), <u>cert. denied</u>, 375 U.S. 954 (1963).

14

those discrepancies to the FBI and asked the FBI to expedite its review and resolution of the discrepancies so Modern Mosaic's work could proceed. ECF No. 39-22 at 2. Modern Mosaic continued to inform Turner of additional discrepancies as Thrasher discovered them through continued analysis of its survey data. ECF Nos. 39-19 at 1; 39-20; 39-21 at 2; 39-23. Although Modern Mosaic's fourth set of shop drawings was returned "Approved as Noted" on April 16, 2012, Modern Mosaic's letters to Turner from April to June 2012 indicate that Modern Mosaic was aware of dimensional discrepancies affecting its now approved corner panels and that those discrepancies had not yet been resolved by Turner, the architect, or the FBI. See ECF Nos. 39-23; 39-24. Nevertheless, Modern Mosaic fabricated the corner panels between April 16 and June 2012, only to find in June that those panels would need to be redesigned due to the dimensional discrepancies. ECF No. 39-24. Thus, Modern Mosaic fabricated the corner panels after it had actual knowledge of the parking garage's dimensional discrepancies but before those discrepancies were resolved. Modern Mosaic did so in the face of known discrepancies and without waiting for those discrepancies to be resolved as required by the Subcontract.

Article XII of the Subcontract provides that "[a]pproval of such shop drawings . . . shall not relieve [Modern Mosaic] . . . of its responsibility for the proper matching and fitting of the [panels] with contiguous work." ECF No. 39-2 at 4. Further,

attachment AP-5 to the Subcontract provides that: "Each submittal must be formally certified . . . and approved by the Subcontractor prior to submission, stating they have carefully reviewed the submittal[ and] verified against field conditions ***prior to fabrication***." ECF No. 39-2 at 14 (emphasis in original).

Nevertheless, Modern Mosaic argues that it was unable to field verify the parking garage before fabrication because Turner failed to provide Modern Mosaic with the "Building Control Lines" so that it could field verify the garage. Attachment **AP-5** provides:

> 25. Benchmarks and Building Control Lines: Initial Control Points and Benchmarks for the site will be brought onto the site by others. Each Trade Contractor shall be responsible for providing their own layout and control. The "Building Control"/reference points and benchmarks will be established for the project by the <u>Flatwork Contractor</u> . . . .

ECF No. 45-3 at 51 (emphasis added). The term "Flatwork Contractor" is not defined in the Subcontract. However, the Subcontract, and specifically AP-5, uses the proper nouns "Contractor" to refer to Turner and "Subcontractor" to refer to Modern Mosaic. These proper nouns make clear that "Flatwork Contractor" references some third party. Thus, the Subcontract provides that the Flatwork Contractor was obligated to provide initial building control points and benchmarks, and that Modern Mosaic was "responsible for providing [its] own layout and control." ECF No. 45-3 at 51. Turner was not obligated to provide building controls for Modern Mosaic, and Modern Mosaic's obligation

16

to fabricate panels for the as-build structure was not absolved because the initial building controls.  Modern Mosaic fabricated the flat-wall panels before its shop drawings were approved and fabricated the corner panels in the face of known dimensional discrepancies.  Thus, Modern Mosaic's damages were the result of its own breach of the Subcontract.

## IV. Conclusion

This Court finds that there is not genuine issue of material fact regarding the parties' contractual obligations and performance of the Subcontract regarding the parking garage.  Turner Construction Company is entitled to judgment as a matter of law as to Modern Mosaic, Ltd.'s parking garage claims.  Accordingly, the defendants' motion for partial summary judgment (ECF No. 39) is GRANTED.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.

DATED:    March 13, 2017

/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE